CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

6/25/2019

JULIA C. DUDLEY, CLERK
BY: s/ J. Vasquez

DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 5:17-cr-00022 |
| | ) | |
| KENDALL DEMARKO WYSINGER | ) | |

**MEMORANDUM OPINION**

Defendant Kendall Demarko Wysinger was charged in a six-count superseding indictment, and he pleaded not guilty and proceeded to trial. The jury found him guilty of the first five counts of the indictment and not guilty on Count 6. Pending before the court is defendant's motion for judgment of acquittal (Dkt. No. 130), to which the United States has responded. (Dkt. No. 132.) Neither party has requested a hearing.

For the reasons set forth herein, the motion for acquittal will be denied in part and granted in part. It will be granted as to Count 5 and will be denied in all other respects.

## I. BACKGROUND

The court will discuss pertinent facts in the context of discussing each count challenged by Wysinger. The jury convicted him of the following five counts:

> Count 1—conspiracy to commit sex trafficking (naming four
> victims: M.A.J., C.S.S., S.I.F., D.L.F.), in violation of 18 U.S.C.
> §§ 1591(a)(1) and 1594(c);
> Count 2—interstate transportation for prostitution of M.A.J., in
> violation of 18 U.S.C. § 2421;
> Count 3—possession with intent to distribute and distribution of
> fentanyl to C.S.S., causing serious bodily injury and death, in
> violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C);
> Count 4—possession with intent to distribute and distribution of
> fentanyl to T.J.M., causing serious bodily injury, in violation of 21
> U.S.C. §§ 841(a)(1) and (b)(1)(C); and
> Count 5—evidence tampering, in violation of 18 U.S.C.
> § 1512(c)(1).

(Superseding Indictment, Dkt. No. 32.)  In his motion, Wysinger challenges the jury's verdict on all counts but Count 2.

## II. DISCUSSION

### A.  Standard of Review

Wysinger's motion for judgment of acquittal is brought pursuant to Federal Rule of Criminal Procedure 29.  That rule provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "A defendant challenging the sufficiency of the evidence faces a heavy burden . . . ."  *United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010) (internal citations and alterations omitted).  Specifically, "[t]he jury's verdict must stand unless . . . no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Royal*, 731 F.3d 333, 337 (4th Cir. 2013) (citing *Young*, 609 F.3d at 355).

Put differently, the motion should be denied if the jury's verdict on any given charge is supported by "substantial evidence."  *United States v. Alvarez*, 351 F.3d 126, 129 (4th Cir. 2003).  "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt."  *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996).  In addressing a claim of insufficient evidence, moreover, this court must "view the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the [g]overnment . . . ."  *Young*, 609 F.3d at 355 (citation omitted).

**B. Count 1**

The jury found Wysinger guilty of Count 1, in which he was charged with conspiracy to commit sex trafficking in violation of 18 U.S.C. §§ 1591(a)(1) and 1594(c). To prove that charge, the government was required to prove, beyond a reasonable doubt, first, that two or more persons formed or entered into a conspiracy, understanding, or agreement to commit sex trafficking; and second, that at some time during the existence or life of the conspiracy or agreement, the defendant deliberately joined it, knowing its purpose.

Wysinger argues that there was insufficient evidence to convict him of this charge because there was no evidence that any agreement was ever reached or that Wysinger was involved with any other person to carry out the "conspiracy." He contends that the only persons with whom he was shown to have an agreement were the prostitutes themselves. As such, he contends that "[a]t most, the government has proven that the defendant was involved as a pimp." (Mot. Acquittal 3, Dkt. No. 130.) He argues that the evidence about Leslee Garza—which was that she took and posted pictures of some prostitutes—was insufficient to make her a co-conspirator, primarily because there is no evidence of concerted action or an agreement.

The court disagrees and concludes that there was sufficient evidence for the jury to convict Wysinger of this charge. In order to show a conspiracy, there need not be direct evidence of an agreement; rather, the conduct of alleged conspirators can give rise to an inference that an agreement exists. *United States v. Collazo*, 732 F.2d 1200, 1205 (4th Cir. 1984). Here, there is evidence that Wysinger and Garza worked together to post online advertisements for other women for commercial sex. There is also evidence that Garza's actions, taken with the approval or at the direction of Wysinger, furthered the conspiracy and that she took these actions with knowledge that the conspiracy involved him profiting from commercial

3

sex acts.  Specifically, Garza and Wysinger exchanged text messages during the alleged

conspiracy in which Garza made statements indicating that she knew Wysinger profited from the

commercial sex acts resulting from the online advertisements.  (*See, e.g.*, Gov't Ex. 24, Dkt. No.

122-36.)  Additionally, the jury heard testimony that Garza lived with Wysinger, at least for a

time, and was present and observed him giving prostitutes drugs and requiring them to engage in

prostitution to earn money to pay him back.  This was occurring at the same time she was

posting pictures of them.  Taken together, all of this evidence is sufficient for a rational jury to

conclude that Wysinger and Garza conspired to commit sex trafficking.[1]

## C.  Counts 3 & 4

One of the ways to prove the charges in Counts 3 and 4 was for the government to prove

beyond a reasonable doubt that Wysinger knowingly or intentionally distributed fentanyl and that

he knew that the substance was a controlled substance under the law at that time.  After finding

the government had established these elements, the jury further determined that, as to Count 3,

C.S.S.'s death resulted from the use of the controlled substance.  As to Count 4, the jury further

determined that serious bodily injury resulted to T.J.M. from the use of the controlled substance.

For each of these findings, the jury had to find that, but for the individual ingesting the fentanyl,

the individual would not have suffered a serious bodily injury or died.

Wysinger first challenges the jury's verdict as to both counts on the grounds that there

was insufficient evidence that it was Wysinger who gave the fentanyl to T.J.M. and C.S.S.   In

particular, he emphasizes that T.J.M. never actually observed Wysinger give C.S.S. the drugs.

---

[1] The evidence concerning the other possible co-conspirator is less strong, although the government
references the evidence in support of the conspiracy charge.  (Opp'n to Mot. Acquit 3, Dkt. No. 132.)  Specifically,
there is evidence that the defendant employed an individual named "Bill," sometimes referred to as the "old man,"
and that Bill transported the victims to pre-arranged "dates" where they planned to—and did—engage in
commercial sex acts.  Because the court finds there was sufficient evidence of a conspiracy between Wysinger and
Garza, it does not address this argument.

The court concludes that there was ample evidence to support both convictions. First of all, T.J.M. credibly testified that she and C.S.S. sought out heroin the day after getting released from jail and that they had not obtained any before C.S.S. called Wysinger to pick them up. They asked him for heroin. Wysinger then drove them from the hotel to his residence in West Virginia, and he left the car for a short time, leaving C.S.S. and T.J.M. in the car. At some point after returning to his car, he provided them with what they thought was heroin but was actually fentanyl.

Although T.J.M. did not physically see Wysinger give the heroin to C.S.S., T.J.M. testified that she was in the back seat and that she was purposefully ignoring the activities in the front seat of the car where C.S.S. and Wysinger were engaged in a sexual act. Moreover, T.J.M. testified that she was constantly in the presence of C.S.S. during this time and she knew that C.S.S. had not received any heroin or fentanyl from any other individual. She testified that Wysinger must have handed it over either during the car ride, or once they got to the hotel, because they had the drugs in the hotel room.

The trio returned to the hotel room where T.J.M. and C.S.S. were staying. Once they arrived at the hotel, Wysinger told them "to be careful" because "people were dying" and "not to overdo it." She testified that she believed he meant that people were falling out (*i.e.*, overdosing) and dying from using the heroin. She and C.S.S. did not have a needle and were waiting for a different friend to bring a needle, but in the meantime both of them snorted some of the drugs Wysinger had given them. They snorted rather than injecting because they did not have a needle and because they wanted to see how strong it was.

Shortly thereafter, T.J.M. left C.S.S. and Wysinger in the hotel room and went and sat just outside the door to the room. She lit a cigarette and believes that, shortly thereafter, she

5

quickly "fell out" and was unconscious.  She awoke later inside the hotel room and testified that

she knew she had overdosed because of how she felt.  In the same room, C.S.S. was lying on the

bed, unconscious and not breathing.  There were no drugs or drug paraphernalia found in the

hotel room.  After T.J.M. called 911 and attempted to perform CPR on C.S.S., she continued to

have difficulty staying conscious.  The emergency personnel that responded were unable to

revive C.S.S., and her post-mortem blood sample showed an extremely high and lethal amount of

fentanyl in her blood.  T.J.M. was taken to the hospital and survived.

In messages Wysinger sent to T.J.M. through Facebook messenger in the days following

the overdoses, Wysinger made some incriminating statements, although he also tried to convince

T.J.M. that C.S.S. had left the room and gone elsewhere to get additional drugs.  His statements

included saying that T.J.M. fell out outside the door and that he brought her body back in the

room.  (*See* Gov't Ex. 34, Dkt. No. 122-52, stating that "u also died that day n I brought u back

in the room.")  He also stated that he "flush[ed]" the drugs left on the table in the room.  (*See*

Gov't Ex. 34, Dkt. No. 122-52.)  The court easily concludes that the foregoing evidence,

especially taken in the light most favorable to the government, was sufficient for the jury to find

that Wysinger provided the fentanyl.

Wysinger next argues that there was insufficient evidence that any fentanyl was the but-

for cause of the serious bodily injury to T.J.M.  (Mot. Acquittal 5–6.)  He notes that "there was

no evidence that exclude[d] the possibility that the combination of the substances" in T.J.M.'s

blood could have resulted in her overdose.  (Mot. Acquittal 5.)  In particular, he relies on the

testimony of Dr. Schneider, who evaluated T.J.M's blood samples, taken that day at the hospital.

Dr. Schneider testified that he had found fentanyl, doxylamine, and dextromethorphan in her

blood.  He also testified that generally a lethal dose of fentanyl would require a minimum of .005

milligrams per liter of blood, but T.J.M.'s blood only had .0044 mg/l, slightly below that lethal dose. From these facts, Wysinger argues that there is a "real possibility that it was a combination of drugs" that had caused T.J.M.'s overdose. (Mot. Acquittal 5.)

Wysinger's theory on this issue is not supported by the evidence. Although Dr. Schneider testified about two other substances detected in T.J.M.'s blood, he did not offer any testimony—nor did any other expert—that it was possible that a combination of drugs had caused the overdose. Indeed, his testimony about the other drugs effectively eliminated any such possibility. He testified that the first substance was doxylamine, a medication found in many different over-the-counter products, generally marketed as either an antihistamine medication or a sleep aid. It was present in a typical therapeutic dose in T.J.M.'s blood and was at the lower end of what would typically be considered therapeutic. Similarly, the second substance, dextromethorphan, is found in many over-the-counter cold medicines. It, too, was present in a typical therapeutic dose in T.J.M.'s blood.

As to the amount of fentanyl, Dr. Schneider testified that the amount in T.J.M.'s blood would be seen in someone who has been using it as a medication for an extended period of time and built up some tolerance or in someone who has consumed a fairly high dosage and may be experiencing overdose-type symptoms. T.J.M. testified that she had not used heroin in about a year and that she had recently been released from jail. Thus, the jury could eliminate the former option. Moreover, all of the evidence was consistent with an overdose. Additionally, the fact that the amount of fentanyl did not reach the minimum threshold for a lethal overdose does not call into question whether the fentanyl caused T.J.M.'s overdose, which was non-lethal.

In *United States v. Alvarado*, 816 F.3d 242 (4th Cir. 2016), there was evidence that the individual who died had heroin, Xanax, and Benadryl in his system. But the only person who

testified on causation had testified that it was the heroin that caused the death and, without it, he would not have died. *Id.* at 248–49. This was sufficient to satisfy the "but-for" causation standard set forth in *United States v. Burrage*, 571 U.S. 204 (2014), and so the appellate court concluded that the trial court's failure to instruct on but-for causation was neither plain error nor an abuse of discretion.

Much like *Alvarado*, there was no testimony or other evidence in this case that would have allowed the jury to find that the fentanyl "was only a nonessential contributing cause" of the serious bodily injury of T.J.M. *See Alvarado*, 816 F.3d at 249. Thus, this case is distinguishable from cases, like *Burrage*, where other drugs are referenced as a potential cause of the death or serious bodily injury. *See Burrage*, 571 U.S. at 207 (noting trial testimony of experts that the cause of death was "mixed drug intoxication" and that three other drugs played a "contributing role"; *see also, e.g., Atkins v. Stancil*, 744 F. App'x 902, 903 (5th Cir. 2018) (per curiam) (explaining that where the medical examiner had concluded the victim died from "acute heroin toxicity" and there was no other claimed cause, the case was different from *Santillana v. Upton*, 846 F.3d 779, 785 (5th Cir. 2017), where the cause of death was "acute mixed drug intoxication"). Here, the amount of fentanyl in T.J.M.'s blood was close to a fatal dose and therefore sufficient to cause the overdose symptoms she experienced, and the other two medicines present in her blood were low levels of therapeutic cold medicine. There was no evidence from which the jury could have concluded that fentanyl was only a "nonessential contributing cause" of those symptoms.[2]

---

[2] Wysinger requests that, if the court were to decline to acquit him of Count 4, that the court "strike the enhanced penalty under 21 U.S.C. § 841(b)(1)(C) for 'serious bodily injury.'" For the same reasons that acquittal on this count in not appropriate, the court denies this request, as well. The jury's finding is supported by substantial evidence.

**D. Count 5**

The jury was instructed that, to find Wysinger guilty of Count 5, it had to find that the government had proved each of the following beyond a reasonable doubt:

> First, that the defendant altered, destroyed, mutilated, or concealed, or attempted to alter, destroy, mutilate, or conceal, a record, document or other object;
>
> Second, that the defendant did so with the intent to impair the object's integrity or availability for use in an official proceeding; and
>
> Third, that the defendant did so corruptly.

(Final Jury Instructions 48, Dkt. No. 126); *United States v. Sterling*, 860 F.3d 233, 245–46 (4th Cir. 2017).

Wysinger challenges the jury's verdict on Count 5 on two grounds. First, he claims that there was insufficient evidence to establish the first element: that he did alter, destroy, mutilate or conceal a document or other object or that he attempted to do so. The court disagrees. The facts set forth above in the court's discussion of Counts 3 and 4 were sufficient for a jury to find that he destroyed an object—the unused drugs in the hotel room. T.J.M. testified that, when she and C.S.S. took the drugs supplied by Wysinger, they were the only three people present, and T.J.M. testified that the two women used only a small portion of the drugs and Wysinger used none. There was certainly sufficient evidence for the jury to conclude that, shortly thereafter, T.J.M. and C.S.S. "fell out" or overdosed, and Wysinger's own after-the-fact statements place him in the hotel room at that time. Additionally, Wysinger told T.J.M. through Facebook messages days later that he had "flushed" the drugs. That statement by him is certainly consistent with the testimony of the responding law enforcement agents and medical personnel, who testified that there were no drugs or drug paraphernalia present when they arrived at the

room in response to the 911 call. All of this constitutes sufficient evidence to establish the first element of Count 5.

Wysinger's second argument is that the government failed to establish that he impaired an object of a crime for the specific purpose of impairing its use or availability in an official proceeding. He points out, in particular, that: (1) there was no investigation of which he was aware on the date of March 23, 2016, and that there was no evidence that any investigation was pending or forthcoming. The government responds that there is no requirement that the defendant knew of an official proceeding or that it had to be pending or about to be instituted, and the statute itself so states. 18 U.S.C. § 1512(f)(1) ("[A]n official proceeding need not be pending or about to be instituted at the time of the offense."). That is accurate insofar as it goes. But the mere fact that no proceeding was pending or imminent is not dispositive.

Instead, in a case decided after this trial and after the briefing on this motion, the Fourth Circuit made clear that any conviction under § 1512(c) must be supported by a certain "nexus" between the defendant's conduct and the official proceeding. *United States v. Young*, 916 F.3d 368, 386 (4th Cir. 2019).[3] The "nexus" requirement stems from a pair of Supreme Court cases that addressed other obstruction statutes: *United States v. Aguilar*, 515 U.S. 593 (1995) (addressing 18 U.S.C. § 1503), and *Arthur Andersen, LLP v. United States*, 544 U.S. 696 (2005) (addressing 18 U.S.C. § 1512(b)(2)(A)).[4] As described by the *Young* court, "§ 1512(c) [requires] that (1) the obstructive conduct be connected to a specific official proceeding (the 'nexus requirement') that was (2) either pending or was reasonably foreseeable to [the defendant] when

---

[3] *Young* involved § 1512(c)(2), but it did not limit its reasoning to subsection (2) and includes several references simply to § 1512(c). *See also United States v. Matthews*, 505 F.3d 698 (7th Cir. 2007) (applying the same "nexus" requirement to § 1512(c)(1)).

[4] As the Seventh Circuit has noted, *Aguilar* was based on a statute that requires a "pending" proceeding, and § 1512 expressly disclaims that any proceeding must be pending or imminent. *Matthews*, 505 F.3d at 708 n.3. Nonetheless, the *Young* court relied on both in reaching its holding.

he engaged in the conduct (the 'reasonable foreseeability' requirement)." 916 F.3d at 385.

Here, the evidence could support that Wysinger disposed of the drugs in order to destroy evidence of a possible crime. But under the plain reasoning of *Young*, that is not sufficient to convict him under § 1512(c). Although at first blush that may seem a strange result, it is one compelled by the "nexus" requirement as it is set forth in *Young*.

In *Young*, the Fourth Circuit overturned the defendant's conviction under § 1512(c)(2) despite evidence that he attempted to deceive the FBI by providing statements consistent with a cover story and perhaps even "sufficient evidence to demonstrate that Young obstructed an FBI investigation." *Id.* at 387. The evidence was nonetheless insufficient to sustain the conviction because there was "no evidence to demonstrate he was aware either that his conduct would affect a grand jury proceeding or that a grand jury or similar proceeding was impending." *Id.* Put differently, he may have designed his conduct to thwart and obstruct an FBI inquiry, which he did foresee, but he did not foresee a specific grand jury investigation. *Id.* His conduct, therefore, lacked the requisite nexus. This was true despite evidence that Young was aware some of his acquaintances had been arrested and that he had a "heightened suspicion of FBI surveillance of him." *Id.* at 388.

Also telling is the *Young* court's discussion of cases from other circuits where evidence was held sufficient to sustain a conviction. It first described *United States v. Binday*, 804 F.3d 558, 590 (2d Cir. 2015), as "finding a grand jury proceeding was foreseeable because the defendant was aware that he was the target of a separate regulatory investigation into an insurance fraud scheme and had destroyed incriminating documents related to the scheme." *Young*, 916 F.3d at 387. It then referenced *United States v. Simpson*, 741 F.3d 529, 552 (5th Cir. 2014), as "finding a grand jury proceeding was reasonably foreseeable to a business owner who

11

had learned about the execution of search warrants for his company and had ordered the deletion of emails after learning of the warrants"). *Young*, 916 F.3d at 387.

The facts of this case resemble *Young* far more than they resemble *Binday* and *Simpson*. Here, there is evidence—in his own words—that Wysinger knew that T.J.M. had overdosed when he destroyed the drugs. Certainly, the jury could draw the reasonable inference that he destroyed the remaining fentanyl in order to prevent it from being found in a criminal investigation. Thus, it is likely he destroyed the drugs in order to hamper a criminal investigation and perhaps even a specifically foreseeable criminal investigation—one that would look into the harm to T.J.M. (or death of C.S.S.). But that alone does not provide sufficient evidence to show that a particular official proceeding was foreseeable to him. Much like in *Young*, a specific investigation may have been foreseeable, but there is no evidence that Wysinger knew there was any current investigation and no evidence that Wysinger reasonably foresaw a particular "official proceeding."

The court is not suggesting that Wysinger's conduct in destroying the drugs was not criminal conduct or otherwise subject to punishment, but simply that it did not violate § 1512(c)(1). *Cf. United States v. Sutherland*, __ F.3d __, 2019 WL 1746946, at *3 (4th Cir. Apr. 19, 2019) (discussing *Young* and clarifying that "[t]o be clear, knowingly giving false documents to a prosecutor without the intent to obstruct a grand jury may violate other federal statutes. E.g., 18 U.S.C. §§ 1001(a), 1519. Just not § 1512(c)(2)."); *United States v. Johnson*, 655 F.3d 594, 602 (7th Cir. 2011) (noting that similar conduct of flushing drugs down a toilet to prevent them from being found during execution of a search warrant by federal agents "likely violated other statutes," and citing "18 U.S.C. § 1519 (obstructing a federal agency investigation); and § 2232 (destruction or removal of property to prevent seizure)").

Neither party cited any cases on this issue, but the court's own research led it to *Johnson*, cited in the preceding paragraph, which is factually similar to this case. There, defendant Lamb had been convicted under § 1512(c)(1) because when police confronted her and told her there was a search warrant for her co-defendant's residence, she refused to wait for the warrant to arrive just inside the door, as instructed. Instead, she "slammed closed the metal door" and then "spent over 20 minutes deliberately eradicating evidence" of illegal drug activity, all "while the police were attempting to force their way into the house." 655 F.3d at 606. On appeal, Lamb argued that there was insufficient evidence that she foresaw grand jury or criminal proceedings. She argued that it could not be sufficient that she merely knew of an investigation and that allowing her conviction to stand would mean that any time a defendant threw drugs out of a car while the police were giving chase, it would constitute a violation of § 1512(c)(1). The Seventh Circuit was not persuaded by her argument, however:

> [The government] simply needed to provide enough evidence that Lamb foresaw that the contraband might be used in an official proceeding and destroyed it with the intent of preventing that use. But why else would Lamb aggressively destroy contraband while authorities were attempting to exercise a search warrant, other than to prevent the discovery of that evidence? And why would she want to prevent that discovery, if not to minimize or eliminate the evidence that could be used against her in a criminal prosecution?

*Id.* The *Johnson* court made clear, though, that its holding should not be interpreted too broadly: "We need not decide whether knowledge of *any* investigation is sufficient for a conviction under § 1512(c)(1), or even whether a person who destroys evidence when confronted with a search warrant *always* violates the statute. It is enough to conclude that under the facts in this case, the jury could conclude that Lamb foresaw a grand jury or criminal proceedings when she destroyed the contraband." *Id.* at 606 n.5.

The Fourth Circuit reached the same result—albeit with far less analysis and in an

13

unpublished decision—when confronted with similar factual circumstances. In *United States v. Stanley*, 533 F. App'x 325, 329 (4th Cir. July 19, 2013), the defendant answered the door and was informed that the people there were investigators from the Internet Crimes Against Children Task Force and were there to pursue an investigation into child pornography activities. He then asked if he could go back into the residence to get dressed, woke his roommate and told him that "[t]he cops are here for my computer," and then placed his laptop in the shower under running water. *Id.* On that evidence, and while acknowledging the nexus requirement, the Fourth Circuit affirmed his conviction under § 1512(c)(1).

The court is not certain that the result in *Stanley* would remain the same after the *Young* decision. Nonetheless, in both *Stanley* and *Young* there was more of a reasonable foreseeability of an official proceeding than there is here. In both of those cases, at the time the defendant was destroying evidence, the defendant could not deny that he (or she) had actual knowledge of an actual investigation into his or her of illegal activities and the evidence the defendant destroyed was evidence of that illegal activity. Here, by contrast, there is evidence that Wysinger may have known that C.C.S. and T.J.M. had overdosed, which would certainly make it reasonable to foresee that a criminal investigation might occur. But no one was waiting at the door with a warrant; no law enforcement agent was asking questions. To allow the jury to conclude that the type of nexus discussed in *Young* was satisfied on the facts here would be to allow the "pure speculation" that *Young* prohibits. *See* 916 F.3d at 388. In short, the court concludes that there was not sufficient evidence from which the jury could find that Wysinger destroyed the remaining fentanyl in order to impair its use in an official proceeding.

## III.  CONCLUSION

For the foregoing reasons, the court will grant Wysinger's motion for acquittal as to

Count 5 and otherwise deny it.  An appropriate order will be entered.

Entered: June 25, 2019.


*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge