**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**HARRISONBURG DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                    **Criminal No. 5:17cr00022**

**KENDALL DEMARKO WYSINGER**

## UNITED STATES' SENTENCING MEMORANDUM

For the reasons set forth below, the United States recommends the imposition of a sentence of life in prison, and a term of supervised release of life in prison, to best serve the goals and purposes of sentencing in the defendant's particular case. Further, the United States is requesting a total amount of $68,775 in restitution to be paid to the victims in this case, pursuant to 18 U.S.C. §§ 1593, 3663, and 3663A.

The United States maintains that this sentence of life in prison applies for five, entirely independent reasons:

(1) the defendant's conviction under 21 U.S.C. §§ 841(a) and (b)(1)(C) on Count Three, involving the overdose death of C.S.S., having committed that offense after a prior conviction for a felony drug offense,[1] results in a statutory mandatory minimum sentence of life in prison, regardless of the sentencing guidelines;

---

[1] While the defendant has challenged whether his prior conviction under Virginia Code § 18.2-248 could be a qualifying prior conviction for a controlled substance offense under the career offender provisions of USSG § 4B1.1, he has **not** raised the same legal challenge to the sufficiency of that conviction under the statutory enhancement for prior convictions of a felony drug offense in 21 U.S.C. § 841(b)(1)(C), as that term is defined in 21 U.S.C. § 802(44). These definitional terms are not the same, and the same legal analysis does not apply. *Coppedge v. United States*, No. 4:09-CR-64-FL-1, 2019 U.S. Dist. LEXIS 57231, at *9 (E.D.N.C. Apr. 3,

(2) the defendant's conviction under 21 U.S.C. §§ 841(a) and (b)(1)(C) on Count Four, involving the serious bodily injury of T.J.M., having committed that offense after a prior conviction for a felony drug offense, results in a statutory mandatory minimum sentence of life in prison, regardless of the sentencing guidelines;

(3) the defendant's sentencing guidelines based solely on his combined adjusted offense level of 43 and his criminal history category of VI, result in a sentencing guidelines range of life in prison;

(4) the defendant is a career offender, based on his conviction for a felony controlled substance offense in Counts Three and Four, and his two prior felony convictions of a controlled substance offense under United States Sentencing Guidelines (USSG) § 4B1.1, his resulting guidelines range is 360 months to life in prison, and his offense conduct warrants a sentence at the top of this guidelines range; and

(5) based on the defendant's offense conduct, the extent and frequency of his criminal history, and the particular characteristics of this defendant, a sentence of life is appropriate, and authorized under the statutory punishment range for Counts 1, 3, and 4, without regard to the statutory enhancement for the defendant's prior drug conviction, the defendant's career offender status, or the particular guidelines range.

For all of those reasons, a sentence of life in prison and a life term of supervised release appropriately reflects the application of the factors set forth under 18 U.S.C. § 3553(a), properly

---

2019); *United States v. Sandle*, 123 F.3d 809, 812 (5th Cir. 1997); *United States v. McGlory*, 968 F.2d 309, 349 (3d Cir. 1992). Should the defendant choose to adopt his arguments regarding Virginia Code § 18.2-248 to challenge whether such an offense could be properly counted as a qualifying predicate under the statutory enhancements for prior felony drug offenses, the response below addresses why that argument would fail.

applies the statutory mandatory minimum sentence under 21 U.S.C. §§ 841(a) and (b)(1)(C), and would satisfy the purposes of sentencing.

## PROCEDURAL HISTORY

On January 16, 2019, a jury convicted the defendant of conspiracy to commit sex trafficking, in violation of 18 U.S.C. § 1594(c), interstate transportation for prostitution, in violation of 18 U.S.C. § 2421(a), and two counts of distributing and possessing with intent to distribute fentanyl, a Schedule II controlled substance, the use of which resulted in the death of C.S.S. and the serious bodily injury of T.J.M., respectively, in violation of 21 U.S.C. § 841(a) & (b)(1)(C).[2]

The defendant's sentencing hearing is scheduled for July 31, 2019, in the United States District Court in Harrisonburg, Virginia.

## SENTENCING LAW

District courts generally must perform the following four steps in sentencing defendants after *United States v. Booker*, 543 U.S. 220 (2005): (1) "properly calculate the sentence range recommended by" the advisory Sentencing Guidelines; (2) "determine whether a sentence within that range and within statutory limits serves the factors set forth in [18 U.S.C.] § 3553(a) and, if [it does] not, select a sentence that does serve those factors;" (3) implement any applicable mandatory statutory limitations; and (4) articulate, on the record, "the reasons for selecting the particular sentence." *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006); *see Booker*, 543 U.S. at 260-65, 268; 18 U.S.C. § 3553(a).

---

[2] The jury acquitted Wysinger of the charge of witness tampering, but convicted him of the charge of evidence tampering. By order dated June 25, 2019, this Court granted the defendant's motion for a judgment of acquittal on the evidence tampering count, based on the Fourth Circuit's opinion in *United States v. Young*, 916 F.3d 368, 386 (4th Cir. 2019), which was issued after the trial in this case. *See* Docket No. 150.

As set forth below, a sentence of life in prison and a term of supervised release of life properly serves the relevant sentencing purposes set forth in 18 U.S.C. § 3553(a).

## I.    Defendant's Advisory Sentencing Guideline Range

### a.  Calculation of Offense Level for Counts 3 and 4

The final Pre-Sentence Investigation Report ("PSR") assigns the defendant's base offense level, at level 43 for Counts 3 and 4, USSG § 2D1.1(a)(1), based on the defendant's prior conviction for a controlled substance offense.  PSR ¶ 22.

The defendant has a prior felony drug conviction pursuant to 21 U.S.C. §§ 841(b)(1)(C) and 851, and that is exactly the "similar drug offense" contemplated in USSG § 2D1.1(a)(1).  In *United States v. Johnson*, 706 F.3d 728 (2013), the Sixth Circuit directly addressed this question and held that the defendant's prior felony drug offense did not need to involve a serious bodily injury or death to warrant application of the base offense level 43.  Indeed, the Court there found that the Sentencing Commission directed courts to "turn to the relevant statute to determine whether USSG §§ 2D1.1(a)(1) and (a)(2) were applicable," and concluded that "the Sentencing Commission intended the term 'similar offense' to by synonymous with the term 'felony drug offense.'"  *Id.* at 731.   The Fourth Circuit has approved the analysis of the Sixth Circuit in an unpublished opinion in *United States v. Fisher*, 683 Fed. Appx. 214, 215 (2017), expressly approving the district court's application of USSG § 2D1.1(a)(1) where the defendant's prior conviction did *not* involve serious bodily injury or death.  In *Fisher*, the Court further found that the "unlawful act" was prescribed in 21 U.S.C. § 841(a), and that provided the basis for comparison for the "similar offense."  *See also United States v. Sica,* 676 Fed. Appx. 81, 85 (2017) (finding the defendant's "suggestion that the phrase 'prior … similar offense' in § 2D1.1(a)(1) must refer solely to convictions for prior narcotics offenses *resulting in death* thus

finds no support in either the Guidelines amendment or the sentencing scheme provided by § 841(b)").  Accordingly, the proper base offense level for Count Group 1 is 43, and the resulting applicable guidelines range is life in prison.

    *b.  Calculation of Offense Level for Counts 1 and 2*

The PSR properly groups Counts 1 and 2 as the conduct relates to M.A.J., with a base offense level of 14 and a 4-level enhancement for coercion under USSG § 2G1.1(b)(1). PSR ¶¶ 28-33.  The PSR properly assigns a base offense level of 14 and a 4-level enhancement for coercion for Count 1 as the conduct relates to C.S.S. under USSG § 2G1.1(b)(1). PSR ¶¶ 34-39. The PSR properly assigns a base offense level of 14 and a 4-level enhancement for coercion for Count 1 as the conduct relates to S.I.F. under USSG § 2G1.1(b)(1). PSR ¶¶ 40-45.  The PSR properly assigns a base offense level of 14, with no enhancement for coercion, as the conduct relates to D.L.F. under USSG § 2G1.1. PSR ¶¶ 46-51.

    *c.  Calculation of Total Offense Level*

Given the disparity between the offense levels between the grouped counts, the PSR properly calculates the combined adjusted offense level at 43.  PSR ¶¶ 52-55.  Importantly, regardless of the calculation of the defendant's criminal history category, a combined adjusted offense level of 43 results in a guidelines sentences of life in prison.

    *d.  Application of Career Offender Guidelines*

The PSR properly considers an enhancement under the career offender provisions of USSG § 4B1.1, which would set the defendant's offense level at 43 and the defendant's criminal history category at VI, result in a guidelines range of life in prison. PSR ¶¶ 56.

The defendant challenges the application of the career offender provisions based on his conviction for possession with intent to distribute cocaine, under Virginia Code § 18.2-248, and

also challenges receiving points on his criminal history for this conviction.[3,4]  PSR ¶ 71.  The

defendant argues that, because the Virginia schedule of controlled substances does not exactly

match the federal schedule of controlled substances, Virginia Code § 18.2-248 cannot be a

predicate prior state controlled substance offense for application of the career offender

guidelines.

Section 4B1.2(b) defines the term "controlled substance offense" as "an offense under

federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the

manufacture, import, export, distribution, or dispensing of a controlled substance (or a

counterfeit substance) or the possession of a controlled substance (or a counterfeit substance)

with intent to manufacture, import, export, distribute, or dispense." USSG § 4B1.2(b).

Here, the defendant argues that the class of state controlled substance laws covered by

USSG § 4B1.2(b) should be limited to those that match, identically, the list of substances

covered by the federal Controlled Substances Act.  On defendant's reading, when a state adds

just one drug to its drug schedules not on the federal schedules, that one drug regulated only by

the state knocks out all of the state's drug violations that *do* involve drugs covered by federal

---

[3] The defendant's argument that he should not receive criminal history points for this offense, based on his apparent objection to the use of convictions under Virginia Code § 18.2-248 for any purpose, (Docket No. 148 at 6-7), completely discounts the defendant's conviction, on that same date, of possession of a firearm by a convicted felon, and the resulting sentence of 2 years to be served consecutively to the drug sentence.  Even were this Court to accept the defendant's argument as to the drug offense, the firearms conviction independently receives 3 points.  So, under the defendant's math, he would still receive a total of 12 criminal history points, resulting in a criminal history category of V, and a resulting guidelines range of 360 months to life (again, using the defendant's math of an offense level 38).  Even crediting all of the defendant's arguments at sentencing, his resulting guidelines offense level encompasses life in prison.

[4] The defendant also challenges receiving criminal history points for the conviction in PSR ¶ 70, as he alleges that the conviction for possession of cocaine under a separate Virginia Code § 18.2-250 should fail for the reasons advanced in his supplemental objections to the PSR.

schedules. Such a reading would entirely eliminate the category of "state controlled offense laws," and collapse it into a provision that requires those laws to match the federal controlled offense laws. Essentially, the defendant asks this Court to read into the guidelines provision a cross-reference to the federal controlled substance schedule, when such cross-reference is entirely absent in the plain text of the Guidelines.

The Fourth Circuit has made plain that such implications and "additions" to the language of statutes and Guidelines is not proper statutory interpretation. "[W]e are required to interpret statutory language as written and are not permitted to add words of our own choosing." *United States v. Sonmez*, 777 F.3d 684, 688 (4th Cir. 2015); *accord E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015) ("[M]ost incorrect interpretations of statutes add words to the law to produce what is thought to be a desired result. That is Congress's province. We construe [the statute's] silence as exactly that: silence."). The Fourth Circuit follows this same principle in construing the guidelines. *See, e.g., United States v. Walker*, 858 F.3d 196, 198 (4th Cir. 2017) ("Of course, we must apply the definition [in the guideline provision] as written, not as Walker wishes it were written.").

Indeed, in confronting a strikingly similar argument, the Fourth Circuit expressly declined a defendant's invitation to incorporate the federal definition of "counterfeit substance" in the Controlled Substances Act into the Guidelines, and thus to limit the category of state offenses that could qualify as predicates. The Court observed:

> Defendant's attempt to incorporate this definition suffers from a fatal flaw: Neither of the Guidelines' provisions at issue here make any reference whatsoever to 21 U.S.C. § 802(7). This omission is significant because the Sentencing Commission clearly knows how to cross-reference when it wants to. . . . Indeed, to apply the federal definition of "counterfeit" here would completely read the word "state" out of Section 4B1.2. But the Sentencing Commission, by specifying that federal *and* state violations serve as predicate

> offenses for career offender status, clearly intended for repeat
> offenders of *both* state and federal counterfeit crimes to be subject
> to an enhanced sentence. *See* U.S.S.G. § 4B1.2(b). It is, moreover,
> routine for states to criminalize conduct that carries no penalty
> under federal law. And, of course, the state police power is not
> grounded in a requirement that a parallel provision of federal law
> also criminalize a defendant's conduct.

*United States v. Mills*, 485 F.3d 219, 222-24 (4th Cir. 2007).

Against this backdrop, the Fourth Circuit has analyzed the very argument presented by

the defendant, and recently decided in an unpublished opinion that "Virginia convictions for

possession of cocaine with intent to distribute in violation of Va. Code Ann. § 18.2-248 were

controlled substance offenses under USSG §§ 2K2.1(a)(2); 4B1.2(b)." *United States v. Pritchett*,

733 F. App'x 128, 130 (4th Cir. 2018) (*cert. denied*, Jan. 7, 2019).[5]  Accordingly, the Fourth

Circuit has already rejected this approach, and this Court should find the defendant's prior

conviction under Virginia Code § 18.2-248 qualifies as a predicate offense for the purpose of the

career offender guidelines.

The defendant urges this Court to apply a categorical approach to this Virginia statute,

and to evaluate the adequacy of the defendant's offense by looking only to what he represents are

the elements of that offense.  While the government strongly contests the defendant's position on

the divisibility of Virginia Code § 18.2-248, as set forth below, we first must address the

defendant's incorrect representation of the elements of this Virginia statute.

According to defendant, every Virginia drug offense fails to qualify as a "controlled

substance offense" because a conviction under Virginia Code § 18.2-248 requires proof only that

---

[5] The defendant relies on the Second Circuit's opinion in *United States v. Townsend*, 897 F.3d 66
(2nd Cir. 2018), to support his argument.  However, as noted above, whenever confronted with
the arguments advanced by the defendant here, the Fourth Circuit has held that it will not limit
the state crime predicates for controlled substance offenses to only those that would qualify as a
federal crime.

the defendant knew the substance was some substance on the Virginia schedules, while federal law requires that the defendant knew that the substance was on the federal schedules. Because the schedules were different, the defendant's reasoning goes, the offenses could not have been the same.

First, the defendant's argument oversimplifies the *mens rea* for federal drug offenses under *McFadden v. United States*, 135 S. Ct. 2298, 2305 (2015). *McFadden* addressed the elements for federal drug offenses involving controlled substance analogues, which are governed by an entirely different statutory definition. *See* 21 U.S.C.S. § 802(32)(A); *McFadden,* 135 S. Ct. at 2302. Indeed, the Court in *McFadden* acknowledged that a defendant could be convicted of distributing a controlled substance, *even if he did not known that the substance was listed on the schedules:*

> The knowledge requirement may also be met by showing that the defendant knew the identity of the substance he possessed. Take, for example, a defendant who knows he is distributing heroin but does not know that heroin is listed on the schedules, 21 CFR §1308.11 (2014). Because ignorance of the law is typically no defense to criminal prosecution, *Bryan* v. *United States*, 524 U. S. 184, 196 (1998), this defendant would also be guilty of knowingly distributing "a controlled substance."

*Id.* at 2304.[6] "[A] defendant who knows he possesses heroin knows all of the facts that make his conduct illegal." *Id.* at 2305.

Similarly, the defendant has failed to show that Virginia law requires, under Va. Code § 18.2-248, the defendant to *know* the substance was on the Virginia controlled substance schedules. Virginia Code § 18.2-248 provides, "Except as authorized in the Drug Control Act . .

---

[6] Any additional reasoning within the Court's opinion in *McFadden* about the knowledge requirement is specific **only** to controlled substance analogues, which are subject to an entirely different definition in the federal code.

., it shall be unlawful for any person to manufacture, sell, give, distribute, or possess with intent to manufacture, sell, give or distribute a controlled substance or an imitation controlled substance." "'To establish 'possession' in the legal sense, it is not sufficient to simply show actual or constructive possession of the drug by the defendant. The Commonwealth must also establish that the defendant intentionally and consciously possessed it with knowledge of its nature and character.'" *Armstrong v. Commonwealth*, 29 Va. App. 102, 114, 510 S.E.2d 247, 252-53 (1999) (quoting *Burton v. Commonwealth*, 215 Va. 711, 713, 213 S.E.2d 757, 758-59 (1975)).  Nothing in the Virginia appellate courts' interpretation of that statute requires that the defendant know that the substance he possessed ***appeared*** on the state controlled substance schedule – as opposed to general knowledge that the substance was illegal for him to possess.

The defendant's reliance on *Sierra v. Commonwealth,* 59 Va. App. 770, 722 S.E.2d 656 (2012), for the proposition that the defendant must "know the substance was controlled under Virginia law" is misplaced.  In *Sierra,* the court held that a defendant need not know the specific identity of the substance, but only a general knowledge of illegality.  *Id.* at 659-60.  The court made this clear in quoting a federal opinion from the Third Circuit:

> "The drug statutes require specific knowledge or intent as to a general category of unlawful items. The specific unlawful items, however, are found in the penalty section of the scheme. Thus, the structure and plain text of § 841 affords no support for a requirement that the Government must prove more than the defendant's knowledge that he was trafficking in a controlled substance."

*Id.* at 661 (quoting *United States v. Barbosa*, 271 F.3d 438, 458 (3d Cir. 2001)).  Nothing in the court's reasoning in *Sierra* requires the defendant know the substance appears on the schedule of controlled substances in Virginia.  The entire opinion focuses on which element of the offense requires the *mens rea;* the opinion does ***not***, as defendant suggests, dispense with proving the

specific identity of the substance charged.  Under *Sierra¸* the Commonwealth still must prove the specific identity of the substance, as an element of the offense. [7]

This distinction is critical, as it establishes that Virginia Code § 18.2-248 is divisible under the categorical approach, and that allows the Court to look to additional documents to determine whether the defendant's conviction is properly counted as a predicate for USSG § 4B1.2. This statute sets out the elements of the offense in the alternative, with a separate offense for each controlled substance, and, thus, the modified categorical approach is appropriate. *Descamps v. United States*, 570 U.S. 254, 257 (2013) (holding that where the applicable statute sets out one or more elements of the offense in the alternative, the modified categorical approach permits sentencing courts to consult a limited class of documents to determine which alternative formed the basis of the defendant's prior conviction); *Shepard v. United States*, 544 U.S. 13, 16 (2005) (holding the relevant documents include the charging document, jury instructions, the statutory definition, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented).

Finally, the conclusion that Virginia's schedule-based drug statutes are divisible is consistent with numerous other states that have similar regimes. *See, e.g.*, *Guillen v. U.S. Att'y Gen.*, 910 F.3d 1174 (11th Cir. 2018) (citing *Henderson*; *Martinez v. Sessions*, 893 F.3d 1067, 1071 (8th Cir. 2018); *Swaby v. Yates*, 847 F.3d 62, 68 (1st Cir. 2017); *United States v. Gomez-*

---

[7] Indeed, that is exactly what the Virginia Court of Appeals found in an unpublished opinion in 2018, where they extended their reasoning in *Sierra* to uphold the conviction of a defendant for two counts of possessing a controlled substance, there heroin and fentanyl, based on the possession of one capsule containing both substances.  *Howard v. Commonwealth*, No. 0780-17-1, 2018 Va. App. LEXIS 151, at *20 (Ct. App. June 5, 2018) ("[W]e conclude that the Commonwealth is not required to prove that a defendant knows each controlled substance that a capsule contains in order to support convictions for both controlled substances contained in the capsule under Code § 18.2-250 — as long as the defendant knows that the capsule contains at least one controlled substance.").

*Alvarez*, 781 F.3d 787, 792 (5th Cir. 2015); *Coronado v. Holder*, 759 F.3d 977, 984–85 (9th Cir. 2014)). Because Va. Code § 18.2-248 is divisible, the Court can look to *Shepard* documents from the defendant's prior conviction.

For all of these reasons, the defendant's prior Virginia conviction for possession of cocaine with intent to distribute under Virginia Code § 18.2-248 is properly considered as a prior state conviction for a controlled substance offense under the career offender guidelines of USSG § 4B1.1, and the PSR properly assessed the defendant as a career offender.

e. *Calculation of Criminal History Category & Resulting Advisory Guidelines Range*

The defendant has an extensive criminal history, spanning 26 years. PSR ¶¶ 59-89. The defendant's Criminal History Category VI, which is assessed without regard to his designation as a career offender, is properly calculated. PSR ¶¶ 74-76.

f. *Resulting Advisory Guidelines Range*

The defendant's resulting advisory Sentencing Guidelines range is life in prison. As set forth above, this range is based on the following, independent factors:

(1) The defendant's conviction under Count 3, with a prior felony drug offense conviction, results in a statutory mandatory sentence of life.

(2) The defendant's conviction under Count 4, with a prior felony drug offense conviction, results in a statutory mandatory sentence of life.

(3) The defendant's combined offense level is properly calculated at 43, which results in a guidelines range of life without regard to criminal history category or designation as a career offender.

## II. The Factors Under 18 U.S.C. § 3553(a) Support a Sentence of Life in Prison

A review of all of the sentencing factors delineated under 18 U.S.C. § 3553(a), indicates that the most appropriate sentence for the defendant is a sentence of life in prison, and a term of supervised release of life, should he be released from incarceration for any reason.

"The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). Specifically, the Court must consider the following goals when determining a sentence: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

In addition to considering the goals of criminal sentencing, the Court must consider the following factors when calculating a sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the Guidelines and Guideline range; (4) the Guidelines' policy statements; (5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (6) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1) and (3)-(7); *United States v. Green*, 436 F.3d 449, 455-56 (4th Cir. 2006).

     a.    *The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant*

The Court shall consider "the nature and circumstances of the offense and the history and characteristics of the defendant" when imposing a sentence. 18 U.S.C. § 3553(a)(1). This Court should find that, irrespective of the defendant's status as a career offender, and irrespective of the defendant's statutory mandatory minimum sentence of life for his convictions under Counts 3 and 4, the nature of the defendant's prior criminal history, the nature of his offense conduct, as set forth in detail at trial, his gang affiliation, and the actions he took after his arrest on these offenses ***independently*** warrant a sentence of life in prison, even if that

13

sentence required an upward departure from the applicable sentencing guidelines.

i. *The Offense Conduct*

These charges all stem from Wysinger's running of an organized prostitution ring since 2015, in which he served as a pimp and a drug source of supply to women working for him in prostitution. Based on the evidence adduced at trial, and recounted in part in the Pre-Sentence Investigation Report, Wysinger operated his prostitution ring in Maryland, West Virginia, and Virginia, using online services to advertise commercial sex to customers. The defendant identified women already working in prostitution as targets for recruitment, or as facilitators to his criminal activities.[8] Many of those women working in prostitution were already addicted to drugs. Wysinger supplied women working in prostitution with heroin during the time he was recruiting them into his prostitution ring as a way of gaining their trust, and then controlled their access to the drug during the time they were working for him. Wysinger used this coercion – controlling their access to and supply of heroin – combined with threats of force and violence to create a climate of fear for his victims that allowed him to maintain his position as a pimp and to profit off of acts of commercial sex.

The dangerous nature of the substances involved in his control methods, and they vulnerability of the victims he targeted, became painfully clear when he distributed fentanyl, purported to be heroin, to C.S.S. and T.J.M. in March 2016. The ingestion of those substances resulted in the near immediate overdoses of both individuals, and the defendant, present at the

---

[8] For instance, Wysinger used some women working in prostitution as sources of information, to help him identify and locate witnesses to his criminal activities, or to care for his child while he was engaged in the crimes set forth in the indictment against him. The defendant served as a source of heroin supply to those women, as well as the women working under his control in his prostitution ring.

scene of the overdoses, did nothing. As the evidence at trial laid bare, the defendant cared only for his own criminal exposure – he dragged an unconscious T.J.M. inside, laid her on the bed next to the unconscious and dying C.S.S., flushed the drugs at the scene, and fled. The defendant did not render any assistance; he did not call for medical help; he did not alert police. Instead, he went back to his house, planned to get his hair done, and, taking comfort that both C.S.S. and T.J.M. were dead, went about his day as if nothing had happened. It was ***only*** after receiving a call from T.J.M., suddenly alert to the possibility of a ***witness*** to his crimes, that he changed his day's plans, and left town.

It could stand to reason that, with the shock of witnessing the overdose of two people right in front of him, one of whom had worked in his prostitution ring and lived in his home, Wysinger would have chosen to stop selling heroin or to stop coercing women into commercial sex. But, as became clear at the trial, the defendant was undeterred in his criminal pursuits, and continued selling heroin, targeting victims, and running his prostitution ring after March 2016. Indeed, in May 2016, Wysinger's cell phone communications showed he was bragging to victims that he had "straight fire," or particularly potent heroin, for them, harassing them into working for him in prostitution, under the threat of cutting off their heroin supply if they refused, and posting women in commercial sex for his own personal profit.

ii.     *History of the Defendant*

The defendant's criminal history reflects his repeated contacts with law enforcement beginning when he was 17, and the very nature and frequency of these crimes reflect the defendant's serious risk of danger to the community and his repeated refusal to comply with the orders of the state courts before which he appeared. A timeline of these events shows that the defendant drew the attention of law enforcement on ***at least 20 separate occasions*** where he was

suspected of violating the law, and the gaps between such law enforcement contact, as reflected

below, show very few months in the last 26 years of criminal activity when the defendant was

***not*** in contact with the criminal justice system:[9]

- **November 1993:** Arrest - Handgun/Crack (PSR ¶ 59)
- **November 1993-April 1994:** Juvenile services supervision (PSR ¶ 59)

*7-Month Gap*

- **December 1994:** Arrest - Distribution Cocaine (PSR ¶ 60)
- **December 1994-April 1997:** Incarceration (PSR ¶ 60)
- **April 1997:** Arrest - Possess marijuana (PSR ¶ 61)

*17-Month Gap*

- **October 1998:** Arrest – Bad Checks (PSR ¶ 62)
- **November 1998:** Arrest – Possess marijuana (P64)

*2-Month Gap*

- **February 1999:** Arrest – Bad Checks (PSR ¶ 63)
- **February 1999-July 2000:** Incarceration (PSR ¶ 61 & PSR ¶ 64)

*10-Month Gap*

- **April 2001:** Arrest – Assault (PSR ¶ 65)
- **April 2001-September 2001:** Incarceration (PSR ¶ 65)

*3-Month Gap*

- **January 2002:** Arrest – Distribute 29 grams crack (PSR ¶ 66)

*2-Month Gap*

- **April 2002:** Arrest – Possession drugs (PSR ¶ 67)

*1-Month Gap*

- **June 2002:** Arrest – False application for weapon (PSR ¶ 68)

*2-Month Gap*

- *September 2002: Arrest – Di*sorderly conduct (PSR ¶ 83)
- October 2002: Arrest – Assault (PSR ¶ 84)
- **January 2003-March 2005:** Incarceration (PSR ¶ 65, PSR ¶ 66, PSR ¶ 67)
- *April 2005: Arrest – Driving Suspended (PSR ¶ 85)*

*2 Months Gap*

- **July 2005:** Arrest – Identity fraud (PSR ¶ 68)

*10-Month Gap*

- **June 2006:** Arrest – Possess 20 grams cocaine (PSR ¶ 70)

*2-Month Gap*

- *September 2006: Arrest – Driving Suspended (PSR ¶ 86)*

*1-Month Gap*

- **November 2006-December 2006:** Incarceration (PSR ¶ 70)

*1-Month Gap*

- **February 2007:** Arrest – PWID Crack, Cocaine, Felon in Possess FA (PSR ¶ 71)

[9] Any law enforcement contacts that resulted only in arrests/charges, with no subsequent conviction or period of incarceration, are indicated in italics.

- **February 2007-January 2012:** Incarceration (PSR ¶ 71)
*26-Month Gap*
   - *April 2014: Driving Revoked (PSR ¶ 88)*
*Documented start of offense conduct in 2014*
   - **May 2016:** Arrest – Prostitution, PWID Heroin (PSR ¶ 73)

The longest period of time where Wysinger had no law enforcement contact, in 26 years, was a mere 26 months. At some point during that time, Wysinger began engaging in the offense conduct at issue in the instant charges.

Wysinger's extensive contacts with law enforcement highlight his sheer disregard for the law, and his inability to be deterred by criminal justice enforcement actions.

iii.    *Characteristics of the Defendant*

The defendant's criminal history is also entirely consistent with the persona he sought to embody – a dangerous member of a criminal street gang that should not be crossed, and who was relentless in his pursuit of crime as a means for making money. As the evidence at sentencing will show, Wysinger showcased his membership in the Gangster Disciples, a national criminal street gang emanating from Chicago, through his statements and by his numerous gang-related tattoos. (Sentencing Exhibit, Intake for Virginia Department of Corrections; Sentencing Exhibit, Tattoo Photos; Sentencing Exhibit, Facebook Discussions).

The United States will call Virginia Department of Corrections Gang Intelligence Unit expert Eric Fentress regarding the intake process at the correctional facility, his review of the pictures of the defendant's tattoos, and the significance of those tattoos to identifying the defendant as a Gangster Disciple. Wysinger claimed membership in the Gangster Disciples during his intake into the Virginia Department of Corrections in 2008, and in two messages with other gang members on Facebook in 2014. Wysinger has several gang-related tattoos visible at nearly all times, including one on his left wrist, one covering the left side of his neck,

and one covering the right side of his neck. These tattoos involve prominently featured, gang-related symbolism, are commonly recognized as symbols of gang membership in the criminal world, and are designed to be a message to those coming in contact with the defendant about his criminal allegiances.

As the evidence at sentencing will show, Wysinger worked to create a climate of fear among those with whom he interacted in prison, claiming to have intentionally killed those that "snitched" to law enforcement and those that interfered in some way with his criminal enterprise. (Sentencing Exhibit, Interview Reports of Confidential Source). The defendant claimed to have killed two women, one in his prostitution ring and one a drug customer, by intentionally providing lethally potent doses of heroin and/or fentanyl.[10] The United States does not suggest that Wysinger in fact intentionally killed either of these additional overdose victims, but that the defendant sought to claim credit for the deaths – regardless of the truth of those claims – as a means of garnering esteem and cultivating fear in those around him in jail.

Wysinger made threats to others a part of his normal course of doing business. J.T. testified at trial that during 2015, the defendant threatened her, believing that she had made statements to law enforcement implicating him in the distribution of heroin to J.H. in June 2015. J.H. worked in prostitution, knew L.G., J.T., and C.S.S. through her work in prostitution, and became a drug customer of Wysinger's during the time she was working in prostitution. In June

---

[10] In statements to a fellow inmate in jail, Wysinger claimed to have intentionally killed J.H., a woman working in prostitution and a drug customer of the defendant, by providing her with a fatal dose of drugs in February 2016, because J.H. was "snitching on him." Wysinger claimed to have intentionally killed L.G., a woman working in the prostitution ring charged in Count One, by providing her with a fatal dose of drugs in November 2016. Wysinger stated he intended to provide a fatal dose of drugs he called a "hotshot" – a lethal dose of fentanyl provided to a known heroin addict – to a witness in the federal case against him to prevent that witness's testimony at trial.

2015, J.H. had recovered from an overdose of heroin she claimed to have received from Wysinger, and told law enforcement that Wysinger was her source of supply.

In response to the defendant's threats, J.T. gave her court discovery papers to Wysinger knowing these papers proved that J.H., not J.T., had in fact "snitched" on the defendant. Wysinger used this information to make threatening comments to J.H. on Facebook. The defendant said to J.H., "I been heard u be tellin on people I didn't believe it to I seen it myself the discovery all the info u gave them on black n white I have a copy of it." (Trial Exhibit 52). On February 28, 2016, J.H. died from a drug overdose, and, as the evidence at sentencing will show, Wysinger claimed to at least one other individual that he was responsible for the drugs that killed J.H.

On November 12, 2016, L.G. died from a drug overdose. L.G. worked in Wysinger's prostitution ring, both as a provider of commercial sex, and as a coconspirator, assisting the defendant in recruiting and advertising other women in prostitution and distributing heroin to women working in prostitution on behalf of Wysinger. Wysinger made threats directly to L.G. As shown in the evidence admitted at trial, in October 2015, Defendant wrote to L.G. on Facebook messenger stating "I'm goin to get u", "I see u will do anything for drug," and "Im goin to kill u bitch." (Trial Exhibit 52). Wysinger claimed to at least one other individual that he was responsible for the drugs that killed L.G.

The nature and circumstances of the offense conduct, and the history and characteristics of the defendant – particularly the defendant's statements and claims regarding intentional, fatal drug overdoses after his arrest on these charges, his gang membership, and his extensive, serious criminal history – warrant a sentence of life in prison. These factors are so serious, and so aggravating, that the Court should find that they are sufficient to warrant a life sentence, regardless

of the application of the career offender guidelines, the statutory mandatory life sentence, and the calculation of the enhanced offense level based on the defendant's prior conviction for a felony drug offense.

    b.    *The Need for the Sentence Imposed to Comply with the Purposes of Sentencing Outlined in Section 3553(a)(2)*

The needs for the sentence imposed to reflect the seriousness of the offense, promote respect for law, provide just punishment, afford adequate deterrence, and protect the public support the sentence recommended by the government. *See* 18 U.S.C. § 3553(a)(2).

As set forth in detail above, the seriousness of the offense here could not be overstated – the defendant targeted vulnerable individuals, manipulated their addiction to coerce them into prostitution, threatened violence, and, as a result of his scheme to control those women working for him in prostitution, caused the overdose of two individuals, one of whom died. Despite his knowledge of those serious events, he persisted in his criminal conduct, as he had done his entire life despite his multiple, significant periods of incarceration. The defendant is exceedingly dangerous to the public, and only a sentence of life in prison will ensure that he no longer poses that threat.

The sentence also must account for the need to afford adequate deterrence to criminal conduct, not only for this particular defendant, but also for others who may contemplate following a similar path of conduct. By imposing the recommended sentence, others may be deterred from undertaking or continuing this type of conduct. The need for general deterrence and the need to protect the public from the defendant support the imposition of a period of life in prison.

    c.    *The Kinds of Sentences Available*

 On Count 1, the defendant faces a statutory maximum penalty of life in prison, a fine of

$250,000, and a term of supervised release of no less than five (5) years and up to life. On Count 2, the defendant faces a statutory maximum penalty of 10 years in prison, a fine of $250,000, and a term of supervised release of no less than five (5) years and up to life. On Counts 3 and 4, the defendant faces a mandatory statutory penalty of life in prison, a fine of $2,000,0000, and a term of supervised release of no less than six (6) years and up to life, based on the enhanced penalties for his prior conviction for a felony drug offense under 21 U.S.C. §§ 841(b)(1)(C) and 851.

The government recognizes that, based on the information contained in the PSR, the defendant is indigent and, accordingly, the $5,000 special assessment mandated by 18 U.S.C. § 3014 for the conviction in Count 1 should not be imposed. The government takes no position on the imposition of a fine.

d.      *The Guidelines and the Guidelines Range*

One of the basic objectives of the Sentencing Commission in developing the advisory Sentencing Guidelines is to "assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2)." 28 U.S.C. § 991(b)(1)(A). Congress has specifically mandated the process by which the Sentencing Guidelines are developed, and "[t]he result is a set of Guidelines that seek to embody the § 3553(a) considerations, both in principle and in practice." *Rita v. United States,* 551 U.S. 338, 350 (2007). "[I]t is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.*

Given the particular nature of the circumstances in the defendant's case, set forth more fully above, a sentence of life in prison and a life term of supervised release is necessary to reflect the gravity of the defendant's conduct.

e.     *Sentencing Commission Policy Statements*

Other than as discussed elsewhere in this memorandum, the United States has not

identified any specific "pertinent policy statements" applicable here.

f.     *The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct*

Because uniformity remains an important goal of sentencing, Section 3553(a)(6) directs

district courts to consider "the need to avoid unwarranted sentence disparities." *Kimbrough v.*

*United States*, 552 U.S. 85, 101 (2007).

The defendant's conduct is significant and unusual, particularly as compared to others

who appear before this Court on sentencings for overdose offenses. The nature of the conduct

here, in the context of the sex trafficking conspiracy, and the defendant's history and

characteristics are significantly aggravating, and this Court should impose a life sentence in

recognition of those factors.

g.     *The Need to Provide Restitution to Any Victim(s) of the Offense*

The government is seeking a total of $68,775 in restitution for two categories of

expenses:

- $64,000 in restitution to M.A.J., pursuant to 18 U.S.C. § 1593.

- $4,775 in funeral expenses, to be paid to a family member of C.S.S. (name and identifying information included in the PSR), pursuant to 18 U.S.C. §§ 1593 and 3663A.

The Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, requires the

Court to "order restitution to each victim in the full amount of each victim's losses ... and

without consideration of the economic circumstances of the defendant." 18 U.S.C. §

3664(f)(1)(A); *United States v. Alalade*, 204 F.3d 536, 538-39 (4th Cir. 2000).

Additionally, the Trafficking Victims Protection Act ("TVPA") makes restitution

mandatory in this case.  Specifically, the TVPA provides that "the court *shall order restitution for any offense under* [chapter 77 of Title 18 of the U.S. Code]." 18 U.S.C. § 1593(a) (emphasis added). Chapter 77 includes conspiracy to commit sex trafficking in violation of 18 U.S.C. § 1594.  With respect to the amount of this mandatory restitution, the TVPA makes clear that a defendant must pay his victim "the full amount of the victim's losses," which includes "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." *Id.* §§ 1593(b)(1), (3).

"[T]he express terms of 18 U.S.C. § 1593 require that the victims in this case, *i.e.*, persons who engaged in commercial sex acts within the meaning of 18 U.S.C. § 1591, receive restitution, notwithstanding that their earnings came from illegal conduct."  *United States v. Webster*, 2011 WL 8478276, at *3-4 (9th Cir. 2011) ("The statutory language is clear that mandatory restitution includes not only the victims' actual losses, but also the defendant's ill-gotten gains."); *United States v. Mammedov*, 304 F. App'x 922, 926-27 (2d Cir. 2008) (finding that women "caused" by the defendant to engage in commercial sex acts were "victims" under Section 1593 and, therefore, that the district court was required to order restitution - regardless of whether the victims had engaged in illegal conduct); *United States v. Williams*, 319 F. Supp. 3d 812, 816 (E.D. Va. 2018) (finding that "it is appropriate, and indeed necessary, to consider the gross income or value of the minor victims' prostitution activities in calculating the amount of restitution owed by defendants here").

The $64,000 owed to M.A.J. is based on her operation in the prostitution ring from January 2015 to May 2015, from July 2015 to August 2015, and from October 2015 to early March 2016, for a total of 10 months, which evidence was established at trial.  M.A.J. testified

that, during that time, she earned on average of $1,600 per week, all of which went to Wysinger. Multiplying that figure times forty (40) weeks, provides a total amount of restitution of $64,000.

The $4,775 owed to the family of C.S.S. is the cost of cremation and funeral expenses after her death, for which the defendant has been held criminally liable.

In a case such as this involving the death of a victim, a court shall require the defendant to "pay an amount equal to the cost of necessary funeral and related services." 18 U.S.C. §§ 3663(b)(3) and 3663A(b)(3).[11] The MVRA further provides for restitution to be paid to victims or victim compensators in place of the victim. 18 U.S.C.A. § 3664(j). Specifically, 18 U.S.C.A. § 3664(j)(1), provides that "[i]f the victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation...."

The government bears the burden of proving the proper amount of restitution by a preponderance of the evidence. 18 U.S.C. § 3664(e). However, "courts have made clear that the amount of restitution need not 'be proven with exactitude.'" *Williams*, 319 F. Supp. 3d at 816 (quoting *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012)). Courts calculating restitution amounts are entitled to rely on any evidence "bearing 'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Baston*, 818 F.3d 651, 665 (11th Cir. 2016) (finding district court did not clearly err or abuse its discretion by relying on sex trafficking victims' trial testimony to calculate defendant's restitution obligations, rather than forcing victims to testify a second time at restitution hearing). Any dispute concerning the amount of restitution is to be resolved by the Court based upon a preponderance of the evidence. *United States v. Waknine*,

---

[11] Specifically, the Court may use its discretion, in any offense, to order "in the case of an offense resulting in bodily injury also results in the death of a victim, pay an amount equal to the cost of necessary funeral and related services." 18 U.S.C. § 3663(b)(3).

543 F.3d 546, 557 (9th Cir. 2008); *United States v. Lewis*, 791 F. Supp. 2d 81, 89-92 (D.D.C. 2011). Evidence can be sufficiently reliable for restitution purposes even where it is not subject to cross-examination. *See United States v. Hairston*, 888 F.2d 1349, 1353 n.7 (11th Cir. 1989) (relying on hearsay evidence to calculate restitution); *In re Sealed Case*, 702 F.3d at 67 (relying on grand jury testimony to calculate restitution).

The government intends to provide evidence and exhibits, which were previously admitted at trial, to support these restitution calculations.

## III.    Sentencing Exhibits and Witnesses

"No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 USC § 3661; USSG § 1B1.4. So long as the information is reliable, the Court may consider it in determining a sentence within statutory parameters. *United States v. Nichols*, 438 F.3d 437 (4th Cir. 2006); *see also United States v. Booker*, 543 U.S. 220 (2005) (advisory guidelines permit judge at sentencing to consider facts not found by the jury).

The United States intends to call the following witnesses:

- Special Agent Tom Hickey, Drug Enforcement Administration
- Eric Fentress, Virginia Department of Corrections

The government will present the sentencing exhibits indicated above,[12] and will also have copies of trial exhibits available for ease of review by the Court during the sentencing hearing. The government will also present the state court records of the underlying convictions at issue in the legal arguments in the case, once the Court has determined which, if any, documents will be

---

[12] All exhibits have been previously disclosed to the defense in discovery.

relevant to establishing the defendant's prior convictions.

Additionally, the government anticipates presenting the victim impact statements of several victims, some of whom we believe will choose to attend in person and address the Court.

## **CONCLUSION**

Accordingly, the United States respectfully asks the Court to impose a sentence of life in prison and a life term of supervised release in this case.

Respectfully submitted,

THOMAS T. CULLEN
United States Attorney

/s/Erin M. Harrigan Kulpa
Assistant United States Attorney
Virginia Bar No. 71168

United States Attorney's
Office 255 West Main Street
Charlottesville, VA 22902
Phone: 434 293-4283
erin.kulpa@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on Wednesday, July 17, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for defendant.

<u>/s/ Erin M. Harrigan Kulpa</u>
Assistant United States Attorney